Southern Energy Homes, Inc. ("Southern Energy"), the defendant in an action pending in the Geneva Circuit Court, appeals from an order denying its motion to compel binding arbitration of the claims filed against it by the plaintiffs, William B. Harcus and his wife Cissy P. Harcus. The materials before us indicate that there are genuine issues of material fact to be decided *Page 623 
as to whether these parties agreed to arbitrate disputes such as those the plaintiffs have made in this action. Because the evidence in the record on this appeal is insufficient for this Court to determine whether the parties agreed to submit the plaintiffs' disputes to arbitration, we remand this case for the trial court to conduct further proceedings consistent with this opinion and with the Federal Arbitration Act and to make factual determinations on those preliminary issues of arbitrability.
 I. It appears from the parties' respective briefs that in December 1997, the Harcuses ordered a custom-built mobile home from Enterprise Manufactured Homes, a retailer of mobile homes.[1] The mobile home was to be manufactured by Southern Energy. The Harcuses borrowed money to finance their purchase, and as part of the sale, traded in their existing mobile home. In connection with the sale, the Harcuses signed a retail installment contract and other documents related to financing.
In January 1998, the mobile home was delivered to the Harcuses. Southern Energy delivered with the mobile home a booklet, labeled "Home Owner's Manual." The Manual contained a limited, one-year written warranty. Southern Energy alleges that it placed the Home Owner's Manual — along with copies of written manufacturers' warranties on appliances and devices installed in the mobile home — inside the mobile home in a conspicuous location. The Home Owner's Manual contains two arbitration agreements — a separate, binding arbitration agreement (the "Arbitration Agreement") and a binding arbitration provision within the terms of the written warranty (the "Arbitration Provision"). The Arbitration Agreement appears on a page by itself, which is, according to Southern Energy, intended to be torn out of the Manual. It contains blank lines for the signatures of the retail dealer and the home owners. The Arbitration Provision, on the other hand, is set out within the body of the written warranty, and it makes no provision for signatures. The Home Owner's Manual also contains several "Home Owner Registration Card[s]." The Home Owner's Manual instructs the homeowner to complete the registration card and mail it to Southern Energy.[2] The written warranty provides that "[t]he `Home Owner Registration Card' must be completed and forwarded to the manufacturer before warranty service can be scheduled." The Harcuses did not sign the Arbitration Agreement in the Home Owner's Manual, nor did they complete or mail the registration card.
The Harcuses contend that they were unaware of the existence of the Home Owner's Manual and the Arbitration Agreement or Arbitration Provision contained within it, and that they discovered the Home Owner's Manual in a kitchen drawer in their mobile home only after they had retained counsel to file this action against Southern Energy. The Harcuses allege that the mobile home was delivered in a damaged, unfinished, and defective condition. Specifically, they allege that upon delivery they discovered what they describe as numerous structural defects, particularly problems with workmanship and with incomplete and improper construction. *Page 624 
The Harcuses say they contacted Enterprise Manufactured Homes to have the problems corrected and that Enterprise Manufactured Homes, in turn, contacted Southern Energy in an attempt to have the problems corrected. Southern Energy contends that on several occasions it received from Enterprise Manufactured Homes orders for miscellaneous parts for the Harcuses' mobile home, and that it received invoices for reimbursement for work it says it did on the Harcuses' mobile home.
The Harcuses allege that on May 5, 1998, two persons purporting to be acting on behalf of Southern Energy did work on the mobile home. It is a matter of dispute whether this work was performed pursuant to Southern Energy's written warranty. Southern Energy contends that it was; the Harcuses contend that it was done to complete unfinished construction that should have been completed before delivery, for example, to install missing wainscoting and molding. The Harcuses further contend that they never requested any repairs or service pursuant to the written warranty.
The record contains a photocopy of a three-page document labeled "Request for Service," which Southern Energy contends is related to the work performed on May 5, 1998. The following typed question and answer appear on the first page of the request form: "Under Warranty? Yes". It is undisputed that Cissy Harcus signed the third page of the request form, directly beneath the statement, "I hereby certify that the parts and work described hereon have been furnished and repairs made to my satisfaction." Cissy Harcus testified by affidavit that the repairmen presented her only the third page of the request form and that she was given a copy of the first and second pages of the request form only after she had signed. Cissy Harcus further testified in her affidavit that she did not know the meaning of the statement on the first page that referred to a warranty. According to Cissy Harcus, the statement could have meant that the work done by the repairmen was warranted by Southern Energy. She stated that she did not understand the statement to mean that she was agreeing to the written warranty contained in the Home Owner's Manual, of which, according to the Harcuses, they had no knowledge at the time.
In June 1998, the Harcuses sued Southern Energy, alleging: fraudulent misrepresentation; fraudulent suppression; deceit; breach of implied warranties of merchantability, of fitness for a particular purpose, and of habitability; and negligent or wanton construction. The Harcuses did not assert against Southern Energy a claim alleging breach of express warranty or a claim under the Magnuson-Moss Warranty — Federal Trade Commission Improvement Act,15 U.S.C. § 2301 to 2312 (the "Magnuson-Moss Act"). Southern Energy moved to compel arbitration, based on the Arbitration Provision contained in the written warranty. That Arbitration Provision reads as follows:
"BINDING ARBITRATION
"IF THE PROBLEM IS STILL NOT RESOLVED
 "All disputes between us not resolved as outlined above and not barred by applicable statutes of limitations or otherwise barred by law, resulting from or arising out of the design, manufacture, warranty, or repair of the manufactured home (including but not limited to: the terms of the warranty, the terms of this arbitration agreement, and all clauses herein contained, their breadth and scope, and any term of any agreement contemporaneously entered into by the parties concerning any goods or services manufactured or provided by Southern Energy Homes, Inc.; the condition of the manufactured home; the conformity of the manufactured home to federal building standards; the representations, promises, undertakings, warranties or covenants *Page 625 
made by Southern Energy Homes, Inc., (if any); or otherwise dealing with the manufactured home); will be submitted to BINDING ARBITRATION, pursuant to the provisions of 9 U.S.C. § 1, et seq. according to the Commercial Rules of the American Arbitration Association then existing in Addison, Alabama, where Southern Energy Homes, Inc., maintains its principal place of business. . . . THIS ARBITRATION SHALL BE IN LIEU OF ANY CIVIL LITIGATION IN ANY COURT, AND IN LIEU OF ANY TRIAL BY JURY."
(Emphasis original.)
In the trial court, Southern Energy argued that the Harcuses had ratified the written warranty and the Arbitration Provision contained within it, by accepting service done pursuant to the written warranty. In support of its motion to compel arbitration, Southern Energy submitted the affidavit of Don McNutt, director of consumer affairs for Southern Energy, who testified that the Harcuses sought and obtained service under Southern Energy's written warranty before filing their action, and that the manufacture and sale of the Harcuses' mobile home involved interstate commerce. The Harcuses opposed arbitration, arguing that they had not agreed to arbitrate their disputes with Southern Energy, that their claims against Southern Energy are not encompassed by the Arbitration Provision in the written warranty, and that enforcement of the Arbitration Provision by Southern Energy is barred by the Magnuson-Moss Act. In August 1998, the trial court denied Southern Energy's motion to compel binding arbitration. In its order denying that motion, however, the trial court made no findings of fact or conclusions of law. The record contains no transcript of the hearing held the motion, nor does it indicate whether the parties presented any testimony or other evidence at that hearing.
 II.
We first address the proper procedure for seeking review of an order denying a motion to compel arbitration. The trial court treated its order denying Southern Energy's motion to compel binding arbitration as an interlocutory order and, at the request of the plaintiffs' counsel, entered a subsequent order purporting to be an order pursuant to Rule 5, Ala.R.Civ.P., allowing the plaintiffs to seek permission to appeal. That subsequent order was unnecessary. A direct appeal is the proper procedure by which to seek review of a trial court's order denying a motion to compel arbitration; the party wanting review need not request permission to appeal. See Crimson Industries, Inc. v. Kirkland, 736 So.2d 597,600 (Ala. 1999); A.G. Edwards Sons, Inc. v. Clark,558 So.2d 358, 360 (Ala. 1990); see also the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16 (1994) (providing that an appeal may be taken from an order denying a motion to compel arbitration).
 III.
As a general rule, the FAA preempts Alabama law and makes an arbitration agreement enforceable if the agreement appears in a contract that evidences a transaction involving interstate commerce. See Crown Pontiac, Inc. v. McCarrell, 695 So. 615, 617
(Ala. 1997). In order for the FAA to apply and preemption to occur, (1) there must be a valid, written arbitration agreement and (2) the contract in which the arbitration agreement appears must relate to a transaction involving interstate commerce. SeePrudential Securities, Inc. v. Micro-Fab, Inc., 689 So.2d 829,832 (Ala. 1997).
This Court reviews de novo a trial court's denial of a motion to compel arbitration. See Crimson Industries, Inc., 736 So.2d at 600; Patrick Home Center, Inc. v. Karr, 730 So.2d 1171, 1171
(Ala. 1999). This Court has stated that a trial court's duty in ruling on a motion to compel arbitration is analogous to its duty in *Page 626 
ruling on a motion for summary judgment and that the trial court is to hold a hearing and determine whether there are genuine issues of material fact concerning the making of, or performance of, an arbitration agreement. See Allied-Bruce Terminix Companies, Inc. v. Dobson, 684 So.2d 102,108 (Ala. 1995). "`[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.'" Ryan's Family Steak Houses, Inc. v. Regelin,735 So.2d 454, 457 (Ala. 1999) (quoting Jim Burke Automotive, Inc. v.Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995)) (alteration in Regelin).
One of the major issues on appeal is whether the Harcuses agreed to arbitrate their claims against Southern Energy. The Harcuses argue that Southern Energy cannot compel arbitration of their claims because, they say, they did not agree to arbitrate any disputes with Southern Energy. Specifically, the Harcuses argue that they did not sign the Arbitration Agreement contained in the written warranty. Southern Energy responds with the argument that the Harcuses ratified the written warranty and the Arbitration Provision contained in it, because, Southern Energy claims, they accepted the benefits of the warranty, in the form of warranty service. The Harcuses contend, however, (1) that they neither sought nor obtained warranty service, but instead sought and obtained only work to complete unfinished construction, work they say should have been done before the mobile home was delivered; (2) that no warranty service was performed by Southern Energy because, they argue, the condition precedent to the performance of warranty service — their completion of the Home Owner's Registration Card — did not occur; and (3) that they did not ratify the written warranty because, they allege, they had no knowledge of the written warranty.
"This Court has clearly and consistently held that a party cannot be required to submit to arbitration any dispute he has not agreed to submit." Ex parte Stallings Sons, Inc., 670 So.2d 861, 862
(Ala. 1995) (internal quotation marks omitted). In determining whether the parties agreed to arbitrate a dispute, this Court applies general Alabama contract-law principles. See Quality Truck Auto Sales, Inc. v. Yassine, 730 So.2d 1164, 1167-68 (Ala. 1999) ("This Court is required to compel arbitration if, under `ordinary state-law principles that govern the formation of contracts,' the contract containing the arbitration clause is enforceable.") (quoting Crown Pontiac, Inc., 695 So.2d at 617). The FAA requires this Court, in applying Alabama contract law to questions of arbitrability, to resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp. v. Mercury Constr.Corp., 460 U.S. 1, 24-25 (1983).
We cannot determine, from the scant record before us, whether the Harcuses agreed, either by ratification or otherwise, to submit their claims against Southern Energy to arbitration. Although the record on appeal contains some evidence, we do not have a sufficient basis to resolve conflicts in that evidence. Therefore, we must remand this case for the trial court to make specific factual findings. On remand, the trial court is to conduct further proceedings and to take evidence as may be necessary, including testimony from such witnesses, by deposition or otherwise, as the parties choose to present. The trial court shall file a return to this remand within 42 days of the date of this opinion. The return to remand shall include a transcript of any proceedings conducted by the trial court on remand, any evidence submitted by the parties, and the trial court's findings of fact *Page 627 
and conclusions of law. See Eubanks v. Hale, [Ms. 1980596, July 2, 1999]752 So.2d 1113, 1120 (Ala. 1999).
REMANDED WITH DIRECTIONS.
Hooper, C.J., and Maddox, Houston, Cook, Lyons, Brown, and Johnstone, JJ., concur.
[1] Enterprise Manufactured Homes is not a party to this case. Apparently, there is presently no dispute between the Harcuses and Enterprise Manufactured Homes or between the Harcuses and the company that financed the Harcuses' purchase of the mobile home.
[2] The Home Owner's Manual states in pertinent part:
 "To help assure your protection, the manufacturer of your manufactured home needs the information which these cards, when completed and mailed, will supply. If you bought your home from a dealer, please be sure that your dealer has completed and mailed a card for you. If you acquired your home from someone who is not a dealer, you should promptly fill out and send a card to the manufacturer."